**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

AMANDA HANNA                                                                                          PLAINTIFF

V.                               CASE NO.: 4:12CV00680 BD

CAROLYN W. COLVIN, Acting Commissioner,
Social Security Administration[1]                                                              DEFENDANT

**MEMORANDUM OPINION AND ORDER**

Plaintiff Amanda Hanna appeals the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act (the "Act"). For reasons set out below, the decision of the Commissioner must be affirmed.

**I.      Background**

On September 4, 2009, Ms. Hanna protectively filed for SSI, alleging disability beginning on October 7, 1994, due to bipolar disorder and back problems.[2] (Tr. 100-101, 118) Her claims were denied initially and upon reconsideration. At Ms. Hanna's request, an Administrative Law Judge ("ALJ") held a hearing on April 5, 2011, at which Ms. Hanna appeared with her attorney. (Tr. 34) At the hearing, the ALJ heard testimony from Ms. Hanna and a vocational expert ("VE"). (Tr. 34-59)

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration. She has been substituted for named Defendant Michael J. Astrue under Fed.R.Civ.P. 25.

[2] At the administrative hearing, Ms. Hanna amended her alleged disability onset date to September 4, 2009. (Tr. 40)

The ALJ issued a decision on June 22, 2011, finding that Ms. Hanna was not disabled under the Act. (Tr. 15-29) On September 24, 2012, the Appeals Council denied Ms. Hanna's request for review, making the ALJ's decision the Commissioner's final decision. (Tr. 1-5)

Ms. Hanna was 32 years old at the time of the hearing. (Tr. 41) She had earned a General Educational Development certificate and had tried to attend college. (Tr. 41) She lived with her husband and two minor children. (Tr. 42) She smoked cigarettes. (Tr. 44) Ms. Hanna described very limited daily activities, but did yoga and light cardio for exercise. (Tr. 51)

## II.    Decision of the Administrative Law Judge[3]

The ALJ found that Ms. Hanna had not engaged in substantial gainful activity since her alleged amended disability onset date. (Tr. 17) And he found that Ms. Hanna had the following severe impairments: asthma, degenerative disc disease of the cervical spine, and depression (Tr. 17) The ALJ also found, however, that Ms. Hanna did not

---

[3] The ALJ followed the required sequential analysis to determine: (1) whether the claimant was engaged in substantial gainful activity; (2) if not, whether the claimant had a severe impairment; (3) if so, whether the impairment (or combination of impairments) met or equaled a listed impairment; and (4) if not, whether the impairment (or combination of impairments) prevented the claimant from performing past relevant work; and (5) if so, whether the impairment (or combination of impairments) prevented the claimant from performing any other jobs available in significant numbers in the national economy. 20 C.F.R. § 416.920(a)-(g) (2005).

have an impairment or combination of impairments meeting or equaling an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.926). (Tr. 17-19)

The ALJ determined that Ms. Hanna had the residual functional capacity ("RFC") to perform light work, with occasional lifting and carrying up to 20 pounds, and frequent lifting and carrying of 10 pounds, except that she would have to work in a controlled environment free from dust, fumes, smoke, and temperature extremes, and was limited to work involving simple tasks, simple instructions, and only incidental contact with the public. (Tr. 19-28)

Although Ms. Hanna had worked, she had never worked at the level of substantial gainful activity, so she had no past relevant work. (Tr. 28) After considering VE testimony, the ALJ determined that Ms. Hanna could perform significant jobs existing in the national economy. (Tr. 28-29) Accordingly, the ALJ found that Ms. Hanna was not disabled.[4] (Tr. 29)

---

[4] The standard of review in this case is whether there is substantial evidence in the record as a whole to support the decision. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011); 42 U.S.C. § 405(g). Substantial evidence is "less than a preponderance, but sufficient for reasonable minds to find it adequate to support the decision." *Id*. (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). In reviewing the record as a whole, the Court must consider both evidence that detracts from the Commissioner's decision and evidence that supports the decision; but, the decision cannot be reversed, "simply because some evidence may support the opposite conclusion." *Id*. (citing *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)).

**III.     Analysis**

    A.     *Plaintiff's Arguments for Reversal*

Ms. Hanna claims that the ALJ's decision was not supported by substantial evidence because: (1) he rejected the opinion of a treating physician; (2) he underestimated the effects of Ms. Hanna's mental impairments; and (3) he erred in finding Ms. Hanna could perform light work. (#11)

    B.     *Treating Physician's Opinion*

An ALJ is generally obliged to give controlling weight to a treating physician's medical opinions when the opinions are supported by the record. See *Ellis v. Barnhart*, 392 F.3d 988, 994-995 (8th Cir. 2005) (citing *Randolph v. Barnhart*, 386 F.3d 835, 839 (8th Cir. 2004); 20 C.F.R. § 404.1527(d)(2)). But an ALJ may discount or even disregard the opinion of a treating physician when other medical assessments are better supported. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012).

In this case, Ms. Hanna argues that the ALJ erred in rejecting the opinion of Laurie O. Hughes, M.D. (#11, pp. 19-20) Dr. Hughes performed a spinal fusion on Ms. Hanna in 1994 for adolescent idiopathic scoliosis. In 1998, Dr. Hughes provided an opinion to the Social Security Administration at Ms. Hanna's request.[5] (Tr. 150) In that opinion, Dr. Hughes noted that Ms. Hanna had no neurological deficits. (Tr. 150) Ms. Hanna was

---

[5] It should be noted that Dr. Hughes provided this opinion over eleven years prior to Ms. Hanna's alleged September 4, 2009 disability onset date.

limited, however, to lifting and carrying a maximum of 25 pounds. (Tr. 150) She could handle objects normally and walk less than two miles without aggravating her back pain. Ms. Hanna was expected to have back pain with prolonged sitting or standing more than a couple of hours. (Tr. 150) The ALJ found the opinion "not to be persuasive." (Tr. 22) Ms. Hanna argues this was error. There are, however, multiple problems with her argument.

First, Ms. Hanna has not shown that Dr. Hughes's opinion related to her condition during the relevant period. Dr. Hughes gave the opinion over a decade before Ms. Hanna's alleged disability onset. CT scans taken in 2009 showed no acute or significant findings and only minimal degenerative changes. (Tr. 458-462)

Second, Ms. Hanna's treating physician during the relevant period, Henry Allen, M.D., noted on the date of Ms. Hanna's alleged onset that she could perform "light duty Community Service." (Tr. 449) Ms. Hanna argues that this "light duty" is not light work, but State agency physicians concluded, after reviewing the medical records, that Ms. Hanna could perform a full range of light work. (Tr. 493-509)

Third, and most important, nothing in Dr. Hughes's opinion would prevent the performance of light work. To perform light work, Ms. Hanna must be able to lift and carry 20 pounds occasionally and 10 pounds frequently. Dr. Hughes limited Ms. Hanna to lifting and carrying a maximum of 25 pounds. (Tr. 150) Ms. Hanna could handle objects normally and had no neurological deficits. (Tr. 150) The full range of light work

requires an individual to stand or walk, off and on, for a total of 6 hours of an 8-hour workday. Dr. Hughes noted that Ms. Hanna could walk less than two miles without any aggravation of her back pain. (Tr. 150)

Dr. Hughes did opine that Ms. Hanna would be expected to have back pain with prolonged sitting or standing. (Tr. 150) But that is the case with millions of people who work full-time, day in day out, at all exertional levels. As with almost every claimant with a back impairment, there is no doubt that Ms. Hanna was experiencing pain; the real issue is the severity of that pain. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001).

When viewed along with the ALJ's RFC findings, the ALJ's consideration of Dr. Hughes's opinion was not error.

    C.     *Mental Impairments*

Ms. Hanna argues that the ALJ erred by underestimating the effects of her mental impairments. (#11, pp. 20-21) The ALJ found that Ms. Hanna had severe depression and limited her to jobs that involve simple tasks, simple instructions, and only incidental contact with the public. (Tr. 17, 19) Ms. Hanna seems to indicate that she was further limited by an inability to interact appropriately with supervisors and co-workers. The record, however, supports the ALJ's findings.

Ms. Hanna specifically notes three Global Assessment of Functioning ("GAF") scores to support her argument that the ALJ "grossly underestimated" her mental impairments. (#11, pp. 20-21) It should be noted that mental health professionals no

longer use GAF scores. The GAF was dropped from the Diagnostic and Statistical Manual of Mental Disorders due to the GAF's "conceptual lack of clarity (i.e. including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." *Diagnostic and Statistical Manual of Mental Disorders*, 16 (5th ed.) Am. Psychiatric Ass'n 2013. As the Eighth Circuit has recognized, a claimant's GAF score may have little or no bearing on the claimant's social and occupational functioning. *Jones v. Astrue*, 619 F.3d 963, 973 (8th Cir. 2010). The records associated with Ms. Hanna's mental treatment show that the ALJ properly assessed her mental limitations. This case does not present a long history of GAF scores that would support reliance on the scores over the rest of the records.

On March 24, 2009, six months before Ms. Hanna's alleged disability onset, she was hospitalized for psychiatric treatment. (Tr. 426-429) She had been kicked out of her home, had no place to live, had discontinued her medications, and had developed an alter-ego. (Tr. 426) She was assessed with depression, back pain, an upper respiratory infection, and drug abuse. (Tr. 428) Ms. Hanna was also consuming a half case of beer daily. (Tr. 426) She was stabilized on celexa and discharged on March 26, 2009. (Tr. 427) By the time of the administrative hearing, she no longer abused drugs. (Tr. 44) Ms. Hanna drank alcohol socially, which would support an ability to interact in a socially adequate manner. (Tr. 44) She was not seeing a mental health professional. (Tr. 55)

Ms. Hanna did not testify about any depression-related limitations in her ability to work. (Tr. 36-55)

Ms. Hanna argues she has a "long history of instability and inability to interact appropriately with supervisors and co-workers." (#11, p. 21)  But as she stated herself, she has never "really worked much at all."[6]  (Tr. 45)  She said she lost her last job for "exploding" on the boss, but stated on both her disability filings and at the hearing that back pain caused her inablity to work.  (Tr. 44-46, 118, 465)  In fact, Ms. Hanna noted that her last boss told her she was wonderful.  (Tr. 44)

It appears that there are only two medical records relating to Ms. Hanna's mental condition during the relevant period.  In the records, Ms. Hanna noted that her stress level was high from dealing with a custody dispute.  (Tr. 510-512)  Her primary care physician prescribed Xanax.  (Tr. 510)  This is hardly the type or volume of medical evidence that would support severe mental limitations.

Two months after her alleged disability onset, Samuel Hester, PhD, found that Ms. Hanna could communicate and interact in a socially adequate and effective manner, and cope with the mental demands of basic work tasks.  (Tr. 469-470)  The ALJ found more mental limitations than supported by Dr. Hester's opinion.  State agency physicians also

---

[6] It appears that Ms. Hanna had never worked, at any point in her life, at the level of substantial gainful activity.  (Tr. 107)

 

found no more than moderate limitations in any of Ms. Hanna's mental functions. (Tr. 473-490)

The ALJ adequately considered Ms. Hanna's depression and related limitations. (Tr. 24-26) The record would actually support less mental limitations than found by the ALJ.

D. *Light Work*

Ms. Hanna argues that the ALJ erred in finding she could perform light work. (#11, pp. 21-22) She relies on Dr. Hughes's opinion that she could not stand for long periods. (#11, p. 21) As noted, Dr. Hughes gave the opinion over a decade before Ms. Hanna's alleged disability onset. More importantly, however, is that Dr. Hughes never said Ms. Hanna could not stand for long periods. Dr. Hughes stated that Ms. Hanna was expected to have back pain with prolonged standing of more than a couple of hours. (Tr. 150) But as noted, millions of people work with back pain. The record is highly supportive of Ms. Hanna's ability to perform light work.

IV. **Conclusion**

The Court has reviewed all of the evidence in the record. There is sufficient evidence in the record as a whole to support the Commissioner's determination that, despite her impairments, Amanda Hanna retained the functional capacity to perform jobs existing in significant numbers in the economy.

Accordingly, her appeal is DENIED; the Commissioner's decision is AFFIRMED, and the Clerk of Court is directed to close the case.

DATED this 5th day of November, 2013.

_____
UNITED STATES MAGISTRATE JUDGE